TOLES *v.* DUPLEX POWER CAR CO.

SPECIFIC PERFORMANCE—PERSONAL PROPERTY—EQUITY—JURISDIC-
TION—ADEQUATE REMEDY AT LAW.

On a bill for the specific performance of a contract for the
sale of stock of a manufacturing concern, where the al-
leged value of the stock is admitted by defendant, and the
transaction was purely a commercial one, there being no
sentimental reason for acquiring the stock, the control of
the concern not being involved, and no uncommon and
appealing equitable consideration which should move the
chancery court to assume jurisdiction being shown, plain-
tiff will be remanded to his remedy at law, under section
12351, 3 Comp. Laws 1915.

Appeal from Eaton; Perkins, J., presiding. Sub-
mitted January 29, 1918. (Docket No. 89.) Decided
July 18, 1918.

Bill by George W. Toles against the Duplex Power
Car Company for the specific performance of a con-
tract for the sale of corporate stock. From a decree
dismissing the bill, plaintiff appeals. Affirmed, and
remanded to the law side of the court.

*Lyman H. McCall* and *Person, Thomas, Shields &
Silsbee,* for plaintiff.

*Colgrove & Potter,* for defendant.

STEERE, J. This bill of complaint was filed in the
circuit court of Eaton county in chancery to enforce
specific performance of an alleged contract for the
sale to plaintiff by defendant of 1,000 shares of its
stock at the par value of $10 per share and to restrain
defendant, or its officers, from distributing cash, stock
or other property received by it in consideration of a
sale of its property, assets, etc., to another company,

See notes in 50 L. R. A. 501; 31 L. R. A. (N. S.) 491; L. R. A.
1915D, 300.

as charged, until plaintiff's rights therein have been determined.

The written evidence offered in relation to the claimed purchase of stock is as follows:

"CHARLOTTE, MICHIGAN, Oct. 27, 1916.
"The First National Bank of Charlotte.    No.—Blank.
74-274.
"Pay to the order of Duplex Power Car Co. $100. One hundred and no one-hundredths dollars.
"G. W. TOLES."
"CHARLOTTE, MICH., Oct. 27, 1916.
"Received of G. W. Toles One Hundred Dollars to apply on one thousand shares of Duplex stock. Balance to be paid on or before Tues. 31st, noon.
"$100.                    FRED MURRAY,
"Sec'y D. P. Car Co."
"CHARLOTTE, MICH., Oct. 30, 1916.
"Dr. G. W. TOLES,
"City.
"*Dear Sir:* I am returning your check given me to apply on D. P. stock, as there was none for sale.
"Very truly yours,
"FRED MURRAY, Sec'y."

Briefly stated, the undisputed facts in this contention are substantially as follows:  Plaintiff is a dentist located and practicing at Charlotte, Michigan, having a brother practicing as a physician in the city of Lansing, who was named as a coplaintiff in the original bill filed in this case but does not so appear in the present record.

Defendant is, or was, a corporation located at Charlotte, Mich., and engaged in manufacturing what is known as the Duplex truck, the claimed merits of which relate principally to a patented four-wheel drive.  This company has been doing business at Charlotte for several years with a somewhat uncertain and turbulent career owing to litigation (*Hill* v. *Town*, 172 Mich. 508; *Town* v. *Duplex-Power Car Co.*, 172

Mich. 519) and other embarrassments, among which was inadequate capital. It had been successful to a degree in developing a type of powerful truck under the patents held by it which is said to have proved practical and established something of a reputation and demand.

F. P. Town, who was its president and general manager, had been for some time endeavoring in various ways to secure an increase in capital by a sale of stock and otherwise, with indifferent success until shortly before this transaction, when, assisted by certain promoters in Lansing, he quietly entered into negotiations with an association of business men which resulted in a profitable sale of the assets and business of defendant to a company formed in the city of Lansing to take the same over and continue the manufacture of said truck.

While this deal was quietly pending and its purposes kept from general knowledge, as was supposed, one of the parties to the promotion informed a friend in confidence of the deal and probability of its being profitably consummated soon in a manner which would result in holders of defendant's stock getting two for one, and advised him to purchase some of the stock. This friend informed plaintiff's brother of the situation who informed plaintiff and they determined to purchase some stock if possible. To that end plaintiff, on October 27, 1916, applied to Mr. Murray, defendant's secretary, in Charlotte, for the purchase of 1,000 shares at $10 a share and gave him to apply on the same a check for $100, taking a receipt therefor. They do not fully agree as to what was said and done in that connection. Plaintiff claims there was an absolute, unconditional purchase and sale of the stock; while Murray contends that it was conditional on his being able to procure the stock, he only agreeing to get it for plaintiff if any was for sale, and he could do so.

Shortly thereafter Murray either telephoned to or saw plaintiff advising him that there was no stock for sale and offered back his check, which plaintiff refused to accept and it was later sent to him by registered mail with the letter quoted. In the forenoon of October 31, 1916, plaintiff made a tender of $10,000 to Town as president of defendant and demanded the stock, which was refused on the ground there was none for sale.

That the fugitive information which reached plaintiff through a surreptitious process of confidential communications was well founded is conceded. Town, who dominated the affairs of the Duplex company, had practically consummated a deal to sell it to the Lansing association at that time, and on October 30, 1916, two written contracts were entered into with him obligating the former to organize a new corporation which would buy on stated terms and take over all the property, patents, franchises and other assets of defendant and continue the business of manufacturing the Duplex truck. It provided that two shares of stock in the new corporation were to be given for every one outstanding in the old; Town was to receive $75,000 in cash or stock in the new company and agreed to acquire control of three-fourths of the outstanding stock in the old, with various other provisions for carrying out the project not necessary to detail or construe here. The two contracts are of the same date and as they appear in the record are between Town personally and the members of the Lansing association, and the president of the new company testified that by one of these contracts, "between the two companies," $310,000 was the amount of consideration, and the amount of the second contract "made as a part of the same transaction" was $75,000.

No preliminary or other writ of injunction was ever granted to plaintiff by the trial court and defendant's stockholders proceeded at a meeting held November

20, 1916, to pass a resolution authorizing the sale of its business and assets to the new company, followed by the various steps requisite to carry out the provisions of the transaction as provided in the contracts. All defendant's rights, assets and business were transferred to a new company by the same name which was organized and authorized to receive them, and the old company ceased doing business as a going, or manufacturing concern.

In the opinion of the trial court dismissing plaintiff's bill it is correctly said:

"Under these circumstances, therefore, the relief now sought is a decree for damages sustained by the plaintiff by reason of the refusal of the defendant company to issue and deliver to him the certificate for 1,000 shares of the capital stock of the defendant company as it is claimed it agreed to do, such damages being measured by the increase in the value of that stock by reason of the sale and transfer to the Lansing concern as stated."

Whatever rights plaintiff claims grow out of an alleged contract made with Murray, acting as the authorized representative of defendant. He ran a shoe store in Charlotte and incidentally had been defendant's secretary since the preceding March. His functions seem to have been somewhat perfunctory, as he says the annual report he swore to was prepared by some one else, he presumed it was Town, and he himself made no investigation to see whether or not it was true. Manifestly Town did not keep him well posted as to what was going on in the affairs of the company for plaintiff, who stated he had not kept track of its financial affairs, was better posted than he. Of the occasion for plaintiff's application to Murray for stock, plaintiff stated he was in Lansing on Thursday, the day before, and there got his first "tip," in the Jury-Rowe store; that the same evening, as he

remembers, his brother called him up by 'phone after he was in his home in Charlotte and—

"said he heard there was a deal talked of, that if I could get some of the stock he thought it would be a good buy. Said he would like some of it. I got back from Lansing that day on the afternoon train, probably between 2 and 4 o'clock. My brother said he thought it was a good time to buy, that they were paying a premium on the stock. I did not tell Murray anything about that."

Murray had not received the tip and was agreeable to selling stock for the company, but testified that he could only do so conditionally and subject to the approval of Town, who had full control of the sale of treasury stock and final authority to pass upon applications to purchase; that he informed plaintiff he would get it for him if any was for sale and would take the order and check conditionally; that having communicated with Town by 'phone in the meantime, he within an hour after the application was made informed plaintiff there was no stock for sale and offered him back his check. Plaintiff gives a different version of the transaction, stating that Murray sold him the stock unconditionally, accepting the check as a cash payment and giving him time for the balance as stated in the receipt.

The whole issue in this case turns on whether there was, in what passed between the two, a valid contract of sale, which, under the testimony, becomes a mixed question of law and fact with no appealing equities either way.

The stock which plaintiff claims to have bought and expected with reason to have made a profit on was personal property. He states in paragraph 13 of his bill of complaint that—

"said stock so purchased by your orator is now of the value of twenty ($20) dollars per share, hence he

says he desires said stock so purchased to be issued and delivered to your orator in accordance with his contract of purchase."

Defendant admits in paragraph 13 of its answer that this is true. In every case where specific performance of a contract is sought in a court of equity the primary question is whether the exercise of the power of the chancery court is demanded to subserve the ends of justice, and where there is an adequate remedy at law to recover damages for breach of the contract equity will not interfere. Manifestly plaintiff's anticipated enjoyment of this contract is con= fined to the enhanced value of the stock of defendant, resulting from the manipulation of which he received advance information, which money damages adequately compass. While by our statute (3 Comp. Laws 1915, § 11899), a court with equity powers may, if it sees fit, decree specific performance of a contract for delivery of ascertained goods, yet the recognized field for equity interference to enforce specific performance of contracts is limited to matters relating to real estate.

"As a general rule specific performance is not decreed where the subject-matter of the contract is personal property; since the compensation which would be recovered in an action at law is deemed to be an adequate remedy for the breach of the contract." 36 Cyc. p. 554.

"It is on the ground that the remedy at law is adequate, that the court, subject to exceptions, will refuse to entertain suits in respect to goods, stock, and other things of a merely personal nature." Waterman on Specific Performance of Contracts, § 16.

The exceptions are in cases where the measure of damages in a court of law will not afford adequate compensation for the breach of contract because the personal property contracted for has to the purchaser a special sentimental value, is something rare or impossible to obtain elsewhere, has no market value or possesses some peculiar characteristic distinguishing its purchase from an ordinary contract of purchase and

sale of personal property. It is true that this doctrine has occasionally been applied to the purchase of stocks shown to have no ascertainable market value, which could not be obtained except from the defendant, where the purchase involved a controlling interest in the corporation or some uncommon and appealing equitable consideration which moved the chancery court to assume jurisdiction; but no such conditions are alleged or proved here. The mere fact of a conflict of testimony as to value, or whether a contract was actually made, furnishes no ground for equitable intervention.

Plaintiff has alleged the value of this stock in his bill of complaint and defendant has admitted the allegation in its answer. He was not attracted to the stock by any desire to become its owner for sentimental reasons. It was with him purely a commercial transaction to which he was moved in a business way by inside information which made the stock attractive as a speculation. We see no reason why the measure of damages for this alleged breach of contract is not as readily ascertainable in an action at law as in chancery. Plaintiff has an adequate remedy at law which he is at liberty to pursue as he may be advised.

The trial court rightly held that a case for specific performance was not shown and its conclusion in that particular is affirmed for the reasons above stated, with costs to defendants, but in view of the provision in section 2, chap. 11, of the judicature act (Act No. 314, Pub. Acts 1915 [3 Comp. Laws 1915, § 12351]), the case is remanded for such further proceedings as may be desired by plaintiff and granted by the trial court, in harmony with the statute and this opinion.

BIRD, MOORE, BROOKE, FELLOWS, and STONE, JJ., concurred. OSTRANDER, C. J., and KUHN, J., did not sit.