# OCTOBER TERM, 1919.*

GARBER *v.* TOWN.

1. CORPORATIONS—OFFICERS—DUTIES—SALE OF ASSETS—FIDUCIARY RELATIONS—TRUSTS—ACCOUNTING.

Where the president of a corporation acted as its salesman in the sale of its assets to another corporation and received, in addition to the purchase price which the stockholders agreed to accept, $75,000 in stock of the purchasing corporation, it being understood between himself and the purchaser that he was to keep $50,000 and turn $25,000 over to another who assisted in putting the deal through, equity will require that he account to the other stockholders for their proportionate share of the additional stock so received by him; it being apparent that it was in reality part of the purchase price.

2. SAME.

Although said president did not personally benefit by the $25,000 so turned over to another, he had no right to make any such arrangement, and, the stock having passed through his hands, he will be required to account for the same. MOORE, J., dissenting.

3. SAME—TRANSACTIONS BETWEEN OFFICER AND DIRECTORS—SALE BY PRESIDENT TO CORPORATION.

Where the president of a corporation made an arrangement with his board of directors to sell to the corporation the premises occupied by it, taking in payment its stock worth $30,000, although a few months before he had offered to sell for $15,000, they will be required to account for the difference in value, in a suit in behalf of the stockholders; transactions between an officer of a corporation and his board of directors being subject to careful scrutiny, and, to be sustained, must have been made in the interest of the corporation.

4. SAME—PURCHASE OF STOCK—ACCOUNTING.

The president of a corporation will be required to account to the stockholders for the extra value of shares of its stock issued to him and charged to his account at par, where they were at the time worth double the par value.

*Continued from Vol. 207.

Appeal from Eaton; Webster (Clyde I.), J., presiding. Submitted October 31, 1919. (Docket No. 106.) Decided December 22, 1919. Rehearing denied April 10, 1920.

Bill by Rolandus A. Garber and others against Frank P. Town and others for an accounting. From a decree for plaintiffs, defendants appeal. Modified, and affirmed.

*Elmer N. Peters, Frank A. Dean* and *Claude J. Marshall,* for plaintiffs.

*William W. Potter, R. L. Sowers* and *Burritt Hamilton,* for defendants.

BIRD, C. J. This litigation grows out of the sale of the assets of the Duplex Power Car Company, of Charlotte, to the Duplex Truck Company, of Lansing, in November, 1916. A reference to the cases of *Hill* v. *Town,* 172 Mich. 508 (42 L. R. A. [N. S.] 799); *Town* v. *Duplex Power Car Co.,* 172 Mich. 519; *Toles* v. *Duplex Power Car Co.,* 202 Mich. 224, and *Bollstrom* v. *Duplex Power Car Co., post,* 15, will be found helpful in the consideration of this opinion.

On October 30, 1916, the following agreement, referred to as Exhibit A, was entered into between the defendant Town, who was at that time president of the car company, and certain residents of Lansing, referred to as the Lansing syndicate:

"This agreement, made this 30th day of October, 1916, between Frank P. Town of Charlotte, party of the first part, and Harry H. Lee, G. W. Hewitt, Harry P. Harper, Elgin Mifflin, W. H. Porter, E. S. Porter, J. Edward Roe, James H. Robinson and H. E. Bradner, all of Lansing, Michigan, parties of the second part, witnesseth as follows:

"Whereas, the parties of the second part propose and intend to organize a corporation for the manufacture and sale of motor power trucks, and it is their purpose and desire when said company is organized to purchase all the property, franchises, rights, privi-

leges, assets and good will of the Duplex Power Car Company of Charlotte, Michigan, and all its patents or rights in patents by license or otherwise, and

"Whereas, the party of the first part is now a large stockholder and general manager of said Duplex Power Car Company, therefore it is mutually agreed as follows:

"1. The corporation to be hereafter organized by second parties as aforesaid will accept a transfer of all the property, rights and assets as above mentioned of the Duplex Power Car Company, and will pay therefor to said Duplex Power Car Company or its stockholders when a good and lawful transfer of said property, rights and assets aforesaid have been made to said new corporation, two shares of stock in said new organization for every one share of stock now outstanding in the said Duplex Power Car Company not exceeding 15,500 shares of the par value of $155,000 in the latter company, or cash equivalent to double the par value of said Duplex Power Car Company stock, at the option of said company or its stockholders. Said new corporation will assume and pay all the debts and obligations of whatever nature of said Duplex Power Car Company.

"It is agreed that this agreement shall not be binding upon any of the parties hereto until all of the parties named herein have signed the same."

In order to carry out the provisions of Exhibit A, Mr. Town caused a special meeting of the stockholders of the company to be held on November 30, 1916, at which more than three-fourths of the capital stock of the corporation was represented. The Lansing syndicate had at that time been organized into the Duplex Truck Company. At this meeting, a resolution was unanimously adopted authorizing the sale of all the property and assets of the car company to the truck company for $310,000; the purchaser to assume and pay all the outstanding indebtedness of the car company as per a schedule of same theretofore agreed on. On such sale the stockholders of the car company were to receive double the par value of their stock in cash or two shares in the truck company for each one of

the car company transferred by them. The contract was afterwards fully performed by conveyance and transfers of the stock by the officers of the car company and the payment of cash and the issuance of shares of stock by the truck company. At the same time that Exhibit A was executed, a further agreement in writing was entered into between Town and the Lansing syndicate, which reads as follows:

"This agreement, made this 30th day of October, 1916, between Frank P. Town, of Charlotte, Michigan, party of the first part, and Harry M. Lee, G. W. Hewitt, Harry F. Harper, Elgin Mifflin, W. H. Porter, E. S. Porter, J. Edward Roe, James H. Robinson and H. E. Bradner, all of Lansing, Michigan, parties of the second part, witnesseth as follows:

"Whereas, the parties of the second part purpose and intend to organize a corporation for the manufacture and sale of motor power trucks, and it is their purpose and desire when said company is organized, to purchase all the property, franchises, rights, privileges, assets and good will of the Duplex Power Car Company of Charlotte, Michigan, and all its patents or rights in patents by license or otherwise, and

"Whereas, the party of the first part agrees to acquire possession and control of not less than three-fourths of the outstanding stock of the said Duplex Power Car Company, and that when he so acquires the same, he shall deposit the same with some bank in Charlotte agreeable to second parties with proxies if so desired.

"First party also agrees that when he acquires such stock he shall use the same and its voting power either personally or by proper proxies to cause and procure a sale and transfer of all the property, franchises, patents, rights in patents as aforesaid, business, good will, rights and privileges of the said Duplex Power Car Company to a corporation to be hereafter organized by the parties of the second part. Said new organization to assume and pay all the debts and obligations of whatever nature of said Duplex Power Car Company.

"It is agreed by second parties that in consideration and on condition that the said Town shall acquire said stock of said company as aforesaid, and shall use

or cause to be used to procure or secure the sale and transfer of all of the property, rights and assets of the said Duplex Power Car Company as aforesaid to said corporation to be hereafter organized by second parties, the said second parties will pay to the said first party at the option of said first party $75,000 in cash or an equal amount of the par value of the stock of said new corporation to be organized by second parties. Said money to be paid or said stock delivered within ten days after said new corporation is organized and said transfer made to it by said Duplex Power Car Company.

"It is agreed that this agreement shall not be binding upon any of the parties hereto until all of the parties named herein have signed the same."

On the same day, Mr. Town signed a writing, reading as follows:

"October 30th, 1916. On fulfillment of the conditions of a certain agreement entered into this day between me and Harry M. Lee, G. W. Hewitt, Harry F. Harper, Elgin Mifflin, W. H. Porter, J. Edward Roe, James H. Robinson and H. E. Bradner, of Lansing, Michigan, I hereby agree to deliver to James H. Robinson, of Lansing, Michigan, $25,000 worth of par value of the stock of the new company, which is to be organized, to take over the assets and business of the Duplex Power Car Company of Charlotte, Michigan."

Town received the $75,000 in cash and stock from the truck company and assigned $25,000 worth of the stock to Robinson pursuant to this writing. The claims of the parties relative to Robinson's connection with the matter will be hereafter stated.

It is admitted by Mr. Town that up to the time of the completion of the sale to the truck company none of the directors or stockholders of the car company had any knowledge of the existence of Exhibit B. On afterwards learning of same, the plaintiffs filed this bill of complaint, on behalf of themselves and all the other stockholders of the car company, praying, among other things, that the sum of $75,000 so received by Town be decreed to be the property of the car com-

pany and that it be distributed among the stockholders according to their respective shares at the time of such sale. We will dispose of this claim before taking up the other questions presented. The trial judge deducted the value of the stock assigned to Robinson, and granted the relief prayed for as to the balance of $50,000.

It is the claim of Town that the agreement under which he received the $75,000 in money or stock had nothing whatever to do with the sale of the property of the car company to the Lansing syndicate. The negotiations by which the deal was brought about were conducted between Town and Louis Rowley, of Lansing. It is Town's claim that the agreement (Exhibit B) does not fairly state the consideration for which it was executed. He testified:

"At the time of these negotiations with Mr. Rowley up to the time this contract was made, not a word, not an intimation of any kind, was made about compensation to me. That question did not enter into the price which I put upon the plant in any way; the negotiations would have gone through just the same whether there had been one dollar paid outside or not; it had nothing to do with it. After that deal had been all completed Mr. Rowley said: 'I have a friend who is interested in this deal; he is the man who first interested the Detroit parties to come up here, but he is not interested in this; that is, he has not been identified, and I feel as this deal has grown out of that, that he is entitled to a little commission,' and I said at once, 'Mr. Rowley, if there is any commission paid any one out of this business you will have to get it from the other end, for I wouldn't take one dollar from the stockholders to pay anybody a commission.' 'Well,' he says, 'Mr. Lee and I have talked this matter over and I can make arrangements so that it will come out of the other end,' and I says, 'Very well, that is none of my affairs; this is the deal and it is made in good faith with the stockholders and it will have to be made. I won't have anything to do with anything further.' 'Now,' he says, 'you know these people are inexperienced in the manufacturing line; I will tell you what we propose to do. These men have simply

been—Mr. Lee was a sales agent in the Reo and Mr. Hewitt was an auditor and bookkeeper, and they knew nothing about manufacturing trucks. It is going to be absolutely necessary for you to remain with the new company for a while.' I said, 'Mr. Rowley, you know my condition at that time; I need a rest and I was going away.' 'Well,' he said, 'we must have your services. We are going to be liberal with you. Mr. Lee said we should be liberal with you, and,' he said, 'we are going for your services—you know there are suits to be taken care of and no one can take care of them as well as you, and to initiate these men into a new business—we are going to give you $50,000 for your services, and I want you to put this $25,000 for Mr. Robinson in with it and call it $75,000.' So it was left that way. I suppose that was a verbal understanding and they could give me what they had a mind to if they wanted my services, but on the 30th they brought what is termed a private contract. That is the contract that has been introduced in relation to the $75,000."

As to this matter Mr. Rowley testified:

"I called his attention to the fact that I wanted to have Mr. Robinson taken care of. I said I was getting my commission from the Lansing end of it, but I thought that Mr. Robinson, who had first called my attention to it and had participated in the Detroit negotiations, should be taken care of. I asked him to do it; he said, 'How will I do it?' 'We will have to add that.' I thought I saw some complications in the way and so I said, 'No, we will arrange that differently.' At this time I also said to him—and this was the first time that matter had ever been broached—that 'In view of what you have done for the Duplex Company' (he told me about the trials and struggles he had had in keeping the thing from going down, and in perfecting the truck and getting it in shape where he could do anything with it, at one time having put over $80,000 of his own money into it) 'I think as a simple matter of justice you ought to have something extra out of this. I think I can arrange that. I think the people over there more thoroughly appreciate the possibilities of this business than anybody else you can possibly deal with, and I think under the circumstances I can put that up to them so

that they will recognize the value of your services here and what you have done and can do for the new company, and we can make that sort of an arrangement and at the same time I can take care of Mr. Robinson in the same way.' "

Rowley further testified that he afterwards took the matter up with the Lansing people and they agreed to it and Exhibit B was prepared and executed the same day as Exhibit A.

Mr. Lee and Mr. Hewitt, two of the Lansing parties, who afterwards became president and secretary and treasurer of the truck company, both testified that Exhibits A and B were executed at the same time and were a part of the transaction which culminated in the purchase of the property. Mr. Lee further said that in order to put the deal across they had to include the $75,000 paid Mr. Town.

Under the facts as stated, we feel constrained to hold that the defendant Town must account to the other stockholders for their proportionate share of this $75,000. While he assumed to make the deal as an individual, he was at that time the president of the corporation and was dealing with corporate property. He occupied a fiduciary relation to the corporation and cannot be permitted to personally profit in any transaction in which its rights or interests were involved. It is apparent that the $75,000 received by him was a part of the purchase price which the truck company paid for this property. The claim that it was to include services to be thereafter rendered by him for the truck company cannot, in our opinion, be sustained. While it may be said to be somewhat supported by the testimony of Mr. Rowley, it is significant that neither Mr. Lee nor Mr. Hewitt was asked concerning it. This money was a part of the consideration paid by the truck company for the assets of the car company and as such it belonged to and became the property of the car company when paid to Mr. Town. The relationship of its officers, and the

duties they owe to the corporation, is well expressed in *Ten Eyck* v. *Railroad Co.*, 74 Mich. 226 (16 Am. St. Rep. 633, 3 L. R. A. 378):

"The entire management of corporate affairs is committed to their charge, upon the trust and confidence that they shall be cared for and managed within the limits of the powers conferred by law upon the corporation, and for the common benefit of the stockholders. They are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their best care and judgment, and exercise the powers conferred solely in the interest of the corporation."

Town assumed to act as a salesman for the corporation in disposing of its assets to the truck company. While acting as such, he cannot secure to himself advantages not common to all the stockholders. In his dealings with the assets of the corporation, while acting as its president, equity will require him to account for all that he receives for the common benefit of all. It was his duty to make the most advantageous bargain possible. While that which he secured to them under Exhibit A may have been entirely satisfactory and considered a good bargain, yet if the rule of fiduciary responsibility were not strictly applied, even in such cases, the temptation for personal gain would in many cases undoubtedly lead to the sacrifice of the interests of the stockholders in order to secure a greater personal profit to the officer. He must not be permitted to assume a relation which will make his interest antagonistic to that of the other stockholders. By his acts in this transaction he received moneys paid on the purchase of the car company's property as a personal profit to himself. These he must be held to have received as a trustee for the other stockholders and be liable to account to them for it. See 10 Cyc. p. 791, paragraphs 8 and 9, and cases cited; 2 Thompson on Corporations, § 1215 *et seq.*

The trial judge determined that "it would not be equitable or just to compel Mr. Town to turn over

something that he did not receive," and determined not to hold him chargeable with the $25,000 worth of stock he had turned over to Robinson. On first impression, this might seem but fair and just. We must, however, not overlook the principle involved. Town did receive this $25,000 in stock of the truck company as a part of the $75,000 paid under the contract, Exhibit B. As before stated, it was a part of the consideration paid by the truck company on its purchase of the assets of the car company. The stockholders of the car company were entitled to have the entire consideration paid for their property pass to them. This $25,000 came into Town's hands while president of the company and as a part of such consideration. He had no right to make any arrangement or give any promise to pay any part of it to any person which would prevent its distribution in the usual way among his stockholders. If Robinson had performed services for the car company for which he was entitled to compensation, his claim therefor should have been presented to the board of directors and passed on in the usual way. If the services he rendered were in assisting Rowley to put through the deal for the Lansing syndicate, his claim should have been presented to them. There was clearly a misappropriation of this stock by Mr. Town and he must account to the stockholders for it.

For several years after the car company began its manufacturing business, the premises occupied by it were rented from two banks in Charlotte, each of which owned an undivided one-half interest therein. On November 11, 1911, the defendant Town purchased the interest of the Eaton County Savings Bank for $2,500, and on May 1, 1915, that of the First National Bank for $3,000. Some improvements had been made before this last purchase, and some were made by him thereafter. The car company paid $100 per month rental for the premises for several years. It is the claim of the defendant Town that in the spring of 1916 he called the attention of the board of directors

to the fact that the credit of the corporation was much impaired and that it would be improved should it own the premises which it was then occupying. He testified:

"Finally, the 2d of August, 1916, I suggested to them that they ought to acquire it in some form; that we didn't have the money, but if they would pay a portion in cash I would carry the balance in stock; but we didn't have the money to spare, at that time as I stated to them, but there had to be something done to get it in the name of the company so as to give us a commercial standing, and we were buying then in large quantities and we needed the credit, and they suggested to me if I would take it in stock they would purchase the factory, and I stated to them I thought I ought to have a portion of it in cash, and they proposed they take an option for three months, and during that meeting and conversation they stated to me that if I decided to take stock at any time I might consider it a sale, and if not, they would let it run until 90 days and then they would see what could be developed in paying a portion of it in cash. All the directors were present at that time.  *  *  *  At the meeting before the annual meeting, which was the 6th of August, or the 5th of August, I decided inasmuch as it was absolutely necessary to have the company have the credit that I would take the stock of the company for the factory  *  *  *  and at the annual meeting on the 6th of August—I guess it occurred on the 5th that year—the 6th fell due on Sunday I think—I made a report to the stockholders and it was talked over and they thought it was a grand good thing."

He further testified that the stockholders expressed themselves as well satisfied with his proposal. The proceedings of this meeting are not inserted in the record, so we assume it contains no reference to the matter. In the minutes of the directors' meeting held on August 2, 1916, three days earlier, we find the following:

"Moved by Mr. Brown and seconded by Mr. White, that the Duplex Power Car Company secure an option

on factory and grounds and machinery belonging to factory now occupied by said Duplex Power Car Company for the term of three months at the price of $15,000.00."

While both Town and Secretary Murray testified that the question of Town's accepting stock for the real estate was discussed at meetings of the board and that he finally agreed to do so, the record is silent as to any such action until a meeting held on November 1, 1916. The minutes of that meeting read:

"Moved by Mr. Brown and supported by Mr. White, that the Duplex Power Car Company purchase the entire plant now occupied by said company, as per option given said company August 2d, 1916. Price to be fifteen thousand ($15,000) dollars, to be paid for in stock of said company at par value."

It is elementary that any agreement made between Town and the board of directors relative to the real estate which rested in parol had no binding force or effect, and yet the property which but a few months before he had offered to convey for $15,000 was now purchased by them from him by authorizing a payment in stock then known to be worth $30,000.

The authorities before cited sustain the rule that all dealings between an officer of a corporation and his board of directors must be scrutinized carefully and to bind the stockholders must bear evidence of having been in the interests of the corporation. By this transaction, all of the stockholders lost their proportionate share of the $15,000 which Town received by reason of the stock being then of double par value. This action of the board cannot be sustained as a fair exercise of its powers. We are constrained to hold that not only the defendant Town, but the other defendants, who were then directors and present at the meeting held on November 1st and acted in the consummation of this transaction, must account for this $15,000 by causing the same to be returned to the treasury of the company.

An undivided one-half interest in this property had been bought by Town in 1911 before he became a director of the corporation. There is no evidence which controverts his testimony that in June, 1916, long before the deal with the Lansing syndicate was under consideration, it was fairly worth $15,000. The trial judge concluded that he should account for the value of the stock at the time it was transferred, which he found to be $22,250. We find no sufficient evidence to support this finding, and conclude that he should account for that which the stockholders would have received had he been paid in cash and that is the sum of $15,000.

The bill of complaint alleges that certain other moneys received by the defendant Town should be charged to him, and prays for a general accounting. This was denied by the trial judge. We have read the record carefully and find there is one other item for which he should account. His agreement with the Lansing syndicate stated the total stock issue of the car company to be 15,500 shares. As a matter of fact, after the issue to him of the 1,500 shares in payment of the real estate, there still lacked 212½ shares to make this number. These were issued to Town at their par value, and charged to his account with the company. As they were worth to him at the time of such issue double their par value, he should account to the company for such extra value, $2,125.

The proof as to other items lacks clearness and is not discussed by counsel in a way to throw much light upon them. They were carried as a credit to Town on the company's books and were a part of the indebtedness which was assumed and paid by the truck company on the transfer. The trial judge, who heard the witnesses and gave these matters due consideration, concluded that it was not in the interest of the stockholders to have the litigation prolonged by a further accounting. With this conclusion we agree.

Except as modified by this opinion, the decree will stand affirmed. A decree may be prepared granting relief to plaintiffs in conformity with this opinion. The plaintiffs will recover taxable costs against the defendants. All other expenses and attorney fees when determined by the trial court shall be paid out of the treasury of the car company before distribution.

STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred with BIRD, C. J.

MOORE, J. (*dissenting*). I agree with most of the conclusions of the Chief Justice in this case; but I think he is wrong in deciding that Mr. Town should account to the stockholders for the $25,000 turned over to Mr. Robinson. The inference from this record is irresistible that the persons who furnished this money did so with the distinct understanding that it was to go to Mr. Robinson, and their understanding of the matter was given effect. Mr. Town should account for what has enured to his personal benefit while acting in a fiduciary capacity, but he ought not to be penalized because of his so acting.

I think the trial judge is quite right in deciding that it would not be equitable or just to compel Mr. Town to turn over what he did not receive. In that respect his decree should be affirmed.

SHARPE, J., did not sit.

### ON APPLICATION FOR REHEARING.

PER CURIAM. The application recently filed in this cause for a rehearing has called our attention to an omission in the opinion filed. By inadvertence, a paragraph was omitted therefrom. The opinion will now be amended by adding the following:

The decree will provide that the bill of complaint will be treated as amended by making the Duplex

Power Car Company a defendant herein. The amount found due by the several defendants will be paid by them to the treasurer of said company and will be disbursed by him to the stockholders entitled thereto at the time of the transfer of the assets of the car company to the truck company on the order of the judge of the circuit court for the county of Eaton, in chancery, subject, however, to the payment of expenses and attorney fees provided for in said decree and any indebtedness of said car company which said judge may find to be a first lien thereon. For the purpose of carrying out this direction, the record will be remanded.

Except as herein amended, the motion for a rehearing is denied.